Maine Medical Center v. Sylvia Matthews Burwell Mr. Stiles I think it's still morning. And good morning, your honors. My name is William Stiles and I'm here on behalf of the appellant Maine Medical Center. And we are here today because a Medicaid claims processing system failed. And the secretary is hoping to capitalize on this failure by avoiding payment of the Medicare crossover bad debts to which her regulations require payment. The basis of the secretary's denial is her so-called must-bill policy. And this policy, which does not appear in the statute, it does not appear in the regulation, it doesn't even appear in the provider reimbursement manual, says that my client must have certain pieces of paper called remittance advices or RAs in order to receive payment. And these are the same pieces of paper that do not exist because of the Medicaid claims system failure. Let me ask you about that because it wasn't clear to me from the record. As I gathered the record, when they were submitted in 01 to halfway through 01 to halfway through to August of 03, they simply didn't get processed due to some glitch in the program. That is correct. Nobody really understands why they didn't get processed, but it's been stipulated that they haven't been processed. Right. But I didn't find anything in the record that says that if your client had simply resubmitted them, they wouldn't have been processed then. Well, first of all, we would say, Your Honor, that that would not be a basis of the CMS Administrator's decision in terms of the basis of the CMS Administrator's decision is that we don't have the RAs and therefore they don't have to pay. But in terms of why that happened, Your Honor, these pieces of paper are not cash transactions. They're pieces of paper. Every single one of them that came out during this time period said we are not going to pay you any amount on these crossover claims and if these pieces of paper had come out, the Secretary would have accepted them and we wouldn't be here today. I'm sorry. But they didn't. Just factually, is there any serious question that if you had resubmitted it, somehow the computer glitch would have been solved and you would have gotten the RAs? The other part is Mr. Mercer explained in his testimony in the record that the system that failed for Maine Medical Center continued to deteriorate and by the time we reached 2004, the system didn't submit or couldn't process any crossover claims and there's also evidence in the record that the Maine Hospital Association went to the Medicaid program during a rulemaking and said you need to process these reports and they said we're not going to do that because there's no payment at all. There is some suggestion in the Secretary's briefs that you all waited and didn't really make an issue out of this until 2006 and maybe if you had acted earlier, we wouldn't be in this situation. Well, first of all, again, that wasn't the basis of the Secretary's decision and we believe under the applicable law that you have to uphold the decision on the basis that it was made. There was no finding that we waited too long in the Administrator's decision. I don't understand the answer to the two questions that have been posed. As a practical matter, could you have resubmitted once the glitch had been fixed? The glitch was not fixed. In fact, the system failed and it was replaced. The system was replaced in 2000 and January of 2005 by a system that didn't work. It couldn't process. At the beginning, it couldn't process any claims and until it was replaced in 2010, it could not process crossover claims, period. What do you point us to in the record that shows that, for example, in late 2003, early 2004, if they had been resubmitted, the glitch would have kept them from being processed again at that time. All I find in the record is that later on, when you then tried to do it, they couldn't do it. It is unknown whether or not if the claims had been reprocessed, but keep in mind, please. But your point is that that issue never was held against you or ruled on. You just said no matter what you lose. But in addition to that, I would say that, again, these are not cash transactions. These are pieces of paper that come up that say they're not, we're not going to pay you and they're not relevant until the Medicare fiscal intermediary comes and audits the cost report. And we provided the documentation, the alternative documentation. We had gone to the state. We had worked with the Muskie Institute. We had done a significant amount of work in an attempt to try to document these crossover claims. So they had gone to the state. The state said we couldn't do that. It's clear why. Their system was failing and they were trying to put a new system in place. All right. And the Secretary's decision is at several different levels. But she rejects your argument that you're in compliance with the four parts set out in the CFR. She rejects that you entered into alternative efforts to try to provide the information. What does she say precisely about why those efforts were inadequate? I think the basis for the decision is that we didn't have the piece of paper, the remittance advice. That was the underlying basis for the determination that there was no reasonable collection effort. All right. One of the difficulties we have in this case is that the government, for whatever reason, has decided to brief this case with a series of reasons which do not, in fact, set forth the reasoning of the Secretary. So I want to go back here because we are forbidden from using that to justify the result the government wants. All right. So let's go back. Let's think of the must-bill as having two different components. One is that you must bill, and the other is you must have proof in the form of the RA to proceed. Now, you've said this must-bill policy is not in the statute, it's not in the regs, it's not even in the provider's manual. I take it as a given that you have billed that portion of the must-bill has been met, subject to this question of resubmission, that what we're really talking about here is not the entire policy but only the RA portion of it. Is that a fair assessment? I would say, yes, it's been stipulated that the claims were submitted. Okay. And they were not processed, and we don't have the remittance advices. On the remittance portion of the Secretary's reasoning, as I understand your brief, the Secretary virtually simultaneously had a contradictory policy that would have permitted submission of this without an RA. That is correct. A major part of your argument depends upon the inconsistency of the Secretary's position for a limited period of time and the lack of clear notice to you that the absence of RAs would doom your claim. In addition to that, I would also add that the requirement, the insistence upon a remittance advice, as the sole basis for denying reads the word reasonable collection efforts right out of the regulation, which we know is from the standards of statutory construction, and this Court applies those to the regulations. What we would have is a situation in which no matter what effort a hospital makes in an effort to get a remittance advice, if they fail because of, in this case, a systems failure, they wouldn't satisfy the Secretary's definition of reasonable collection efforts as she's applying it in this case. But I think the question that you are getting to is, in terms of our alternative documentation, what is missing? What does the Secretary say is missing? And I think what they're saying is missing is the amount of the payment. And we know what the amount of the payment is. The documentation was put together in terms of the understanding pursuant to the main care regulation that they didn't pay crossover claims, the fact that they didn't pay crossover claims. So I think there's... should have sued the State of Maine. In the Secretary's view, Maine was not free not to recognize and pay at least a portion of these claims. And that the Secretary cannot sue directly to force Maine to do that. They can sue to get a determination that what Maine was doing was illegal as a matter of federal law. But that the remedy is unsatisfactory. And therefore, the reasonable collection efforts should have concluded... should have included your being put in the position of establishing the illegality of what Maine was doing. I don't understand that to actually be what the Secretary said. But that seems to be the argument that is being made to us here. What would... if I understand your question correctly, you're saying we should have sued them. We should have sued them. Even if you sued them in one, you wouldn't have got any RAs. You wouldn't get a judgment. I think that's certainly the outcome. Assuming what we'd be suing for is pieces of paper that say we're not going to pay you. The hospitals certainly weren't aware at the time... I didn't know that the Secretary wanted more than that. Certainly Maine Medical Center and the hospitals in Maine weren't aware of the Secretary's position at the time. And certainly the Secretary was aware of this situation. There is correspondence in the record talking about how we went to the fiscal intermediary, they went to CMS. They were certainly aware, but they didn't step in. They're the ones that can enforce their state plan. The Medicaid statute sets up parameters that states have to comply with in order to receive federal funds. This court has decided, and I'm blanking on the name of the case now, that if providers don't like the rates that Medicaid pays, they can vote with their feet. And that statement was made in a case that found that providers don't have jurisdiction under 1983 in order to seek a change in the provider's rates. Here the rates were clear. They said we've eliminated crossover bad debts. The hospitals assume that they've gone through the proper state plan amendment procedure. We had no reason to believe that they didn't. And another thing that I would add is that hospitals, I think they're talking about the Quimby's, the qualified Medicare beneficiaries. A hospital doesn't know whether a Medicare patient is a Quimby or a non-Quimby. They simply have a Medicare card. And so these provisions, the hospital would have to appeal each and every, and for Maine Medical Center we're talking about thousands, if not tens of thousands of claims a year on the basis, if we take the Secretary's position to its fullest extent, that we would have to challenge each and every remittance advice that we receive. Well, if I've understood the logic of this, on your claim, the federal government will, if you were successful, end up paying roughly $4 million, $5 million, I don't know the amount here, a portion of that as bad debt. But the federal government, having or now believing that Maine should have made that payment, has no recourse to go back against Maine to recover that sum. The Medicare program, I think they're just under $3 million of crossover bad debts at issue, and they would pay 70 percent of that amount. And they feel they shouldn't have to charge the federal taxpayers. Maine should have paid a portion of that. Well, the federal taxpayers cover about two-thirds of the same percentage of the cost of a Medicaid program in Maine, which would pay not, under the Secretary's theory, if it's true, they would pay perhaps more than. However, the Secretary has been aware of this. All hospitals in Maine, when they got this piece of the paper, would hand them over to the Secretary. She would pay it. And she hasn't gone back. If she's truly concerned about this issue, she hasn't gone back and reopened, which she has the authority to do. So I'm finding a bit of a contradiction. If the pieces of paper had come out, we wouldn't be here, because they would have paid us the amount that we're seeking today. They're simply trying to capitalize on the fact that this system has failed, and we certainly tried to work with the Medicare program to get them the documentation that they would find acceptable. They said nothing short of a remittance advice is going to be available. So if we were to conclude that the Secretary's decision on these limited facts was arbitrary and capricious, what would be the remedy? Well, I think the remedy would be the acceptance of our alternative documentation that we've supported. Let me know, from a court's point of view, what is the remedy? A reversal of the Secretary's position? I would say a reversal of the CMS Administrator's decision and implementing the decision of the Provider Reimbursement Review Board. Thank you. Good morning, Your Honors. Good morning. I'm Jeffrey Clare. I'm Justice Department Counsel for the Secretary. Your Honors, I'd like to go immediately to what's on these pieces of paper, a kind of pejorative label for what's the central issue of the case. What the Secretary expects on these pieces of paper are two sorts of determinations. First, the State is supposed to determine whether a Medicare beneficiary who's received hospital services at a point in time is also a Medicaid-eligible beneficiary or a qualified Medicare beneficiary. Two things that have determinations that have immediate consequences for Medicare's obligation under the statute to pay and its obligation to recognize so-called bad debts. If the patient is a Medicaid beneficiary, they may be deemed indigent and the provider is excused from making further collection efforts for the cost-sharing costs. If they are not indigent, then the provider may have further obligations to pursue the beneficiary before claiming it as a bad debt from the Medicare program. So that, as the Administrator did note expressly in the decision, that is an important determination that is made in these remittance advices, these pieces of paper. Secondly, if it is a Medicaid... I'm sorry, the hospitals don't know whether they're qualified or not. That's a decision made by whom? The State Medicaid program. Okay. And one of the reasons the remittance advices are important is the beneficiary's income and resources may change and his or her eligibility may change. The State Medicaid program's eligibility rules may change. As a general rule of thumb, does one know roughly what percentage will turn out to be qualified? I don't believe that's in the record. I did some background research in preparing for argument. I came across a Congressional Research Service report that estimated the percentage of all Medicare beneficiaries who are also qualified Medicare beneficiaries is I believe it was between 5% and 10% of all Medicare beneficiaries. That doesn't necessarily help us here. I'm only trying to answer Your Honor's question. But there is a... the Secretary does need for the purposes of administering this program an official State determination from the State Medicaid program of whether under the State's current rules and the beneficiary's current financial circumstances the beneficiary is also a Medicaid beneficiary. The second thing that's in the so-called pieces of paper is a determination of what amount, if any, the State Medicaid program is going to pay. Now here's how it's supposed to work under the Federal statute. If you are a qualified Medicaid beneficiary, as a matter of Federal law, the State Medicaid program has an obligation to review the claim and to determine whether some payment has to be made. I'm referring specifically to 42 U.S.C. 1396 little a, again little a 10, that makes clear that the State Medicaid program must provide some cost assistance, some medical assistance for these qualified Medicaid beneficiaries. Now the amount of payment for a qualified Medicaid beneficiary depends on the circumstances of the case, and that may vary. In some cases it may be deemed indeed be zero. But in other cases it will not be zero. And here's why that's so. Because the way the Medicaid program's obligation is supposed to be determined under Federal law is the Medicaid program is supposed to take this claim for a Medicaid and duly qualified Medicare beneficiary. It is supposed to know for the services rendered at the pertinent point in time what did the Medicare program pay. Then if the State's payment amount is in excess of what Medicare actually paid, then the State has an obligation under Federal law to provide some additional compensation for the provider. It's obvious why these pieces of paper would be helpful for the reasons you're stating. But don't we have a case here where the administrator rejected the claim based on the fact that the pieces of paper, the RAs, don't exist and were not produced? And it's a sort of per se rule that as I read the administrator's decision, it made no difference to the administrator why they weren't available. And yet I find nothing in the regs during the time period when these claims were incurred and processed that puts the provider on notice that no matter what you do, no matter how reasonable your collection efforts, even if you bill, if the State refuses to provide it, you're out of luck. Well, Your Honor, first this, I think, Your Honor, second to the last point, the Medicare program manual, this is section 322, it is at page 85 of the addendum rather, the appendix says that where the State is obligated either by statute or under the terms of its State Medicaid plan to pay any or all, to pay all or any part of the Medicare deductible or coinsurance amounts, those amounts are not allowable as bad debts under the program. Now, to go to the remainder of Your Honor's question, we certainly appreciate that the hospital is in a difficult position here. From our view, it is some of these payments, or at least a portion of them, are in the first instance the State's responsibility. It is the State's responsibility to process the claim and to make some determination of payment. If the State isn't doing that, certainly we can appreciate that the provider can be whipsawed between the requirements of the Federal Government and the requirements in what is, in our view, the State's disavowal of a legal obligation to process the claim and make payment. But it is not enough for the provider to simply throw up its hands when the State fails to discharge a legal obligation and then say, well, because the State has disavowed this obligation, now suddenly these are fully the obligations of the State, of the Federal Government. But now you're mutating the argument. I didn't understand the administrator. Your whole brief made all these arguments that seemed to me weren't before us. The administrator, as I understand it, said, I don't care what Maine Medical Center did. They don't have the remittances. Period. It's a per se rule. And now you're defending, you're saying there are all these other reasons they could have done more stuff. We don't get to that, do we? We have to decide whether the per se rule is lawful as applied during the time period that's before us. Your Honor, I think you do get to that question for this reason. Certainly the administrative decision before the Court basically stopped with the determination that we don't have the remittance advice we need. On appeal, the provider is challenging the reasonableness of this determination by saying, well, we couldn't do that. And I think it is fair for the government to respond to a challenge to the administrative determination. So you're saying we could issue a decision that says the administrator was wrong about a per se rule. However, we find the administrator would have, had she gotten to the issue, found the collection efforts still inadequate. They could have sued them. We can't do that. We're not asking for that kind of determination. We're saying the Secretary's determination that a remittance advice is reasonable, for the reasons I've outlined earlier, that it has important information about Medicaid eligibility. But I think now you're not answering my question. My question is, if we were to find the per se rule that this decision seems to hinge upon is incorrect, don't we have to at least remand for the administrator to consider all your other arguments? We can't reach them. Well, Your Honor, I'm just accepting the terms of Your Honor's hypothetical. If you were to conclude that you cannot simply affirm on the basis of the administrative determination, then we would submit that in that circumstance the appropriate remedy would be remand with directions to the Secretary to consider whether it is reasonable for a provider to simply stop upon receiving some indication from the State that the claims can't be processed. We don't think you need to do that. But now let's get to the issue, then, that you agreed before us. What specific language do you point to? Because the language you point to didn't address the remittances at all, as I understand it. What specific language put Maine Medical Center on notice that there was this per se rule that even if they bill and even if there is a pronouncement that none of them will be paid and even if no remittances are issued, they're out of luck because of the per se rule? Well, Your Honor, we submit that it is a reasonable interpretation of the Medicare rule that does require that the claim be uncollectable when it's submitted and that in the sound business judgment of the provider it will not be collected in the future. Bear in mind that, you know, there is a sort of analogy to private sector claims and creditor-debtor relations in general, that if someone who owes you money doesn't pay that money, an ordinary recourse and remedy is to bring suit to force the person who has that obligation to honor the obligation. That doesn't strike us as an unreasonable requirement. The manual provisions specifically reference to the conduct or threat of litigation as a reasonable collection effort. That's in manual section 310. And the provisions for recovering in the instance where there is a state Medicaid program involved refer back to Suppose they sued and lost. Then what would have happened? I can't really speak for the Secretary. The Administrator says she'd still deny it. It's not clear that that would be the case, that the Administrator would still deny in that case. Your Honor, I don't mean to be cagey. I just cannot tell you what the Secretary would do in that kind of circumstance. It's a bit unclear to me whether the Administrator actually reached the question of whether the hospital's alternative efforts would have satisfied the regulation. It is certainly correct that a per se rule emerges. But it is unclear to me whether this other issue was in fact addressed. Are you saying it was not addressed and therefore a remand is required? No, Your Honor. I think Your Honor is referring to the manual provisions that were in effect between 1995 and 2004 before they were declared invalid by the Ninth Circuit. After 2004, the Secretary revised the manual provisions to remove that alternative documentation route. These claims were not given to the Secretary until I'm sorry. I'm going back to the regulations which do require that a reasonable alternative effort needed to have been made. You can respond to me by saying that the Secretary made a mistake. The alternative that was floated once is illegal and we can't consider it. Or you could say that the Secretary, I'm sorry, the Administrator actually reached the question of whether the wasn't for reasons independent of not having an RA. It's just not clear to me what was actually decided here. Well, Your Honor, I apologize. I am a little confused by Your Honor's hypothetical for this reason. The alternative documentation language is not in the regulations. That is only in the manual provision that was issued in 1995. It was no longer in effect as of 2004. And these claims were not submitted until 2005. So that alternative documentation provision wasn't in effect at the time these claims were submitted. And for that reason, the Administrator didn't speak directly to it. As we've indicated in our brief, even if it had been in effect, the only thing that the provider provided, submitted here, was an indication of whether these beneficiaries would be eligible for Medicaid. It did not provide the second prong, the second thing that's required in these pieces of paper, which is a determination from the State of whether it was going to make any payment or not. Now, the only thing the provider points to is a State manual provision that says at one point in time, it was issued in 1985, where the State of Maine says we're not paying any crossover payments, period. And from that, the provider is arguing to the Court that, well, Medicaid had no obligation to make payment because of this manual provision. Well, a State Medicaid provision cannot trump the provisions of the federal statute. These are, as the Court may know, cooperative federalism programs in which if the State volunteers to participate, it is bound by the requirements of federal law. There is a requirement of federal law that, at least in some circumstances, a qualified Medicaid care beneficiary is entitled to some payment from the State. The State, to the extent the State manual provision says otherwise, it is incurred. Help me. How does that differ from the RAs? In other words, the State could say, flat out, we're paying none of these. Or the State could just deny them all and issue RAs. As I understand it, you don't challenge the latter, if the State had just given Maine Medical Center RAs for zero for all of these. Your Honor, I don't understand how the State could possibly do that on an across-the-board, categorical way, consistent with the requirements of federal law. Ah, yes. But suppose they do it inconsistent with the requirements of federal law, but no court has ever said that. They just deny the RAs. Is that acceptable? No, Your Honor, and for this reason, I think it's important to note here that we are dealing with costs that are not, in the first instance, the responsibility of the federal government. These are costs that the statute places in the first instance. They are cost-sharing. They are deductibles. They are, in the first instance, the responsibility of the Medicare beneficiary. It is only when those, the beneficiary is unable to make payment and when no other third party is responsible does the Medicare program have responsibility. And the Medicare program, consistent with Congress's intent, has fairly strict rules as to establishing that, well, your debt is now going to be our responsibility. And it is not enough for a provider to simply say, the State won't do what it's supposed to do, now it's the Medicare program's responsibility. That's not how the statute works, Your Honor. But suppose they submitted the RAs. Are you saying that the Secretary would then say, sorry, that may be the State's position, but we, the feds, are not on the hook for at least a portion of this because the State should have assumed, so that, in fact, there is a requirement in addition to submitting the RAs? Well, Your Honor, the Administrator's decision turns on the lack of an RA. It would be kind of a contradiction in terms for the State to submit an RA without going through the steps necessary to process the RA. But States do things like that. They do, and if they simply disavow legal obligations, that does not make the expense the responsibility of the Medicare program. There are remedies available to providers in this circumstance. They can sue. They can bring an action under 42 U.S. 1983 to compel the State to honor its requirements with federal law. This Court, it's a decision. The District Court cited the Rio Grande Community Health case at 56F3rd. But that confuses me, too, because Congress said the test would be sound business judgment established that there was no likelihood of recovery at any time in the future. That's the regulatory requirement, yes. And you're saying that no matter whether the business judgment are sound or not, they've either got to get the RAs or sue? We don't read the Administrator's decision that way. In this case, all the State did, all the provider did, was throw up its hands after the State refused to process the claim. There may be, if we had a different factual record before the Court, the Secretary might evaluate the circumstances differently. The adjudicatory process does state in fairly general terms concepts like sound business judgment and reasonable collection efforts. These are things that by nature can vary with the circumstances of the case, and the Secretary might well consider an inability to compel the State to issue these claims as indicating that the claim is, in fact, uncollectible. Nothing like that happened here. The State simply, the provider simply threw up its hands when the State said, not as a matter of State law, but basically our computer system can't handle your claims. We're not going to give you an answer. The provider said, okay, good enough. Now it's the responsibility of the Medicare program. Not good enough. The regulations make clear that the provider has to make a reasonable collection effort. That's not a reasonable collection effort. Your Honors, I'm out of time. I'd be happy to answer any further questions from the Court. You know what, I'm going to give your opponent two minutes, and then you may have a minute after that. Sounds good. Thank you. Thank you, Your Honors. One point that they're heavily relying upon is that we've just thrown up our hands, and that is not the case. The board, the PRRB, which was created by Congress to hear these types of cases, it weighed the evidence that we submitted. It listened to the testimony of the witnesses, and it found, made specific findings that the Maine Medical Center actively pursued the RAs, that they were not available for reasons beyond the provider's control. At a later date, but it didn't find that they actively pursued them at the time they were denied. In fact, it appears they didn't even notice that they were denied. One thing also that counsel said, that these claims weren't submitted until 2005. That is not true. Pursuant to the evidence in the record and the stipulations, Your Honor, there is a trading partner agreement between the Medicaid program and the Medicare program where the claims were identified, and they would cross over to the state. So the Medicare program itself submitted these claims on a timely basis. It is correct that when these RAs weren't produced, but again, these are non-cash transactions, and they only become relevant many years down the road when the Medicare fiscal intermediary shows up to audit the cost report. So the provider wouldn't necessarily be looking for the RAs that say we aren't going to pay you, because the only thing that they're really relevant for is when the Medicare auditor shows up and says we need to see your RAs. And by that time, it was stipulated in the record that by that time, the provider had submitted the alternative documentation. So it's clear that the provider made substantial efforts. They had to go back and get the Medicare electronic remittance advices to identify whether the claims crossed over, and they found evidence that they did. They then had to reconstruct the list of claims over a long period of time.  To use the eligibility tables to verify eligibility for the dates of service for each of these claims. And they also worked within a framework where the information was provided to the state. The state couldn't produce the RAs. We ran into system failures, and in terms of suing, we would be suing for not for money. We would be suing for a remittance advice that says that we aren't going to pay you anything. Now, whether the state was doing it. Where in the stipulation does it indicate that the claims were submitted to the administrator, to Medicare, prior to 2005? There are stipulations about the trading partner agreement, and there is also testimony. I've got that in front of me in the stipulation. The stipulation says the crossover claims were submitted to MaineCare by the MAC. That is correct. MaineCare is the Medicaid program. So where is there evidence that it was submitted for reimbursement to the federal government? The trading partner agreement, Your Honor, is the state of Maine gives the eligibility tables to Medicare. And so when the claims come to Medicare in the first instance, these are Medicare primary claims. They run up against the eligibility table. So when did the state of Maine do that? What's that? When did the state of Maine do that? The trading partner agreement? No, when did they submit the claims to the federal government? The hospitals, pursuant to the trading partner agreement, because these are Medicare primary claims, they submit the claim to Medicare. Medicare then uses the Medicaid eligibility tables to identify any crossovers. And then on a weekly basis, they submit these crossover claims to the state. That is part of the stipulation. And also Mr. Mercier, in his testimony before the Board, explains this system in greater detail. But it's the Medicare program, because these are Medicare primary claims, Medicaid secondary, that they go directly to the Medicare program, and then pursuant to this electronic system, Medicare then transfers the claims to the Medicaid program. Thank you. Counsel? Your Honor, briefly, Your Honor is correct that the claims may have been submitted to the Medicaid program earlier, but in our reading of the record, they were not submitted to the Medicare program for further payment as a bad debt until 2005, several years after the close of the cost year. And finally, again, this notion that the remittance advice would always have been zero and it's a meaningless procedural hoop to force the provider to get a determination that the Medicaid claim is always zero, not so under federal law. A quick example, the times relevant here, the Medicare deductible for an inpatient hospital stay was around $840. If you had a quick visit and the deductible had not been met, the Medicaid program would have had an obligation to pay any, the difference between what Medicare paid, zero, and whatever the Medicaid rate would have been at that time. It may not be a lot, it may not be so, it may not be a positive amount in every case, but it would be a positive amount in at least some cases, and the statute requires that that be undertaken. Thank you very much. Thank you.